# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BRYAN K. WHITE and SURESH KUMAR, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 12369-VCL |
| ) | |
| CURO TEXAS HOLDINGS, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Date Submitted: December 12, 2016
Date Decided: February 21, 2016

Kevin G. Abrams, Daniel R. Ciarrocki, ABRAMS & BAYLISS LLP, Wilmington, Delaware; S. Michael McColloch, S. MICHAEL McCOLLOCH, PLLC, Dallas, Texas; Karen Cook, KAREN COOK, PLLC, Dallas, Texas; *Attorneys for Plaintiff Bryan K. White.*

Kevin G. Abrams, Daniel R. Ciarrocki, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Dan C. Guthrie, Jr., LAW OFFICES OF DAN C. GUTHRIE, JR., Dallas, Texas; *Attorneys for Plaintiff Suresh Kumar.*

William M. Lafferty, Thomas W. Briggs, Jr., Richard Li, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Kevin B. Huff, David L. Schwarz, Courtney S. Elwood, Daniel G. Bird, KELLOGG, HUBER, HANSEN, TODD, EVENS & FIGEL, PLLC, Washington, D.C.; *Attorneys for Defendant Curo Texas Holdings, LLC.*

**LASTER, Vice Chancellor.**

In the Texas Purchase Agreement, defendant Curo Holdings granted advancement rights to plaintiffs White and Kumar.[1] White and Kumar demanded advancements, but Curo Holdings refused to pay.

White and Kumar sued to enforce their advancement rights. Curo Holdings moved to dismiss their complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief could be granted. In the Rule 12(b)(6) Decision, this court rejected the arguments that Curo Holdings advanced in favor of dismissal. The Rule 12(b)(6) Decision characterized Curo Holdings' central contention—that White and Kumar's personal indemnification rights under the Texas Purchase Agreement were limited by provisions in a separate article governing deal-related indemnification—as "not even colorable." *Id.* at *21. The court subsequently granted summary judgment in favor of White and Kumar, holding that they were entitled to advancements. *See* Dkt. 49 (the "Entitlement Order").

The Entitlement Order did not quantify the amounts of advancements that White and Kumar would receive. Instead, it directed the parties to determine the amounts by following a set of procedures described in *Danenberg v. Fitracks, Inc.* (*Fitracks II*), 58 A.3d 991 (Del. Ch. 2012) (the "Fitracks Procedures").

---

[1] Unless otherwise specified, capitalized terms and abbreviations retain the meanings ascribed to them in *White v. Curo Texas Holdings, LLC*, 2016 WL 6091692 (Del. Ch. Sept. 9, 2016) (the "Rule 12(b)(6) Decision").

1

Under the Fitracks Procedures, the senior Delaware counsel for the party seeking advancements oversees the preparation of a detailed submission supporting the advancement request and certifies that the amounts sought fall within the scope of the advancement right. If the responding party objects, the senior Delaware counsel for the responding party oversees the preparation of a similarly detailed set of objections and certifies that those amounts fall outside the scope of the advancement right. After the exchange of written materials, the senior Delaware lawyers confer in good faith in an effort to resolve disputes without court involvement.

After engaging in this process, Curo Holdings took the position that 83% of the amounts that White and Kumar sought were not subject to advancement. Curo Holdings lodged many objections against White and Kumar's expenses, but also contended that its refusal to pay White and Kumar constituted a breach of the Texas Purchase Agreement. As Curo Holdings read the agreement, this meant that the agreement's cap on deal-related indemnification limited White and Kumar ability to receive advancements—a reprise of the agreement that the Rule 12(b)(6) Decision rejected as "not even colorable." *Id.* Relying on its objections, Curo Holdings only paid the undisputed 17%, even though the Fitracks Procedures require a minimum payment of 50%, with the excess over the undisputed amount held in escrow by Delaware counsel for the party seeking advancements.

White and Kumar moved to recover the amounts they sought. This decision largely grants their motion. It also awards White and Kumar a proportionate amount of their enforcement expenses, including for time spent engaging in the Fitracks Procedures. In granting only a proportionate award, this decision strains to give Curo Holdings the benefit

of the doubt, because a strong argument can be made that Curo Holdings acted in bad faith by raising serial and multitudinous objections to White and Kumar's demands for advancement, such that Curo Holdings should bear 100% of their enforcement expenses.

## I. FACTUAL BACKGROUND

The Entitlement Order determined that the Qui Tam Action and the Government Investigation were covered proceedings under the Texas Purchase Agreement. It also determined that White and Kumar were Indemnified Persons for purposes of the Qui Tam Action and the Government Investigation. It concluded that White and Kumar were "entitled to advancement under Section [8.03(a)] of the Texas Purchase Agreement for the reasonable fees and expenses they have incurred and will incur for the Qui Tam Action and the Government Investigation." Entitlement Order ¶¶ 5–7, 10. The court separately concluded that White and Kumar were not entitled to indemnification of expenses incurred in defending the Brown Action because they had agreed in the settlement of that proceeding to bear their own expenses. Dkt. 48 ¶ 2.

The Entitlement Order did not quantify the amount of advancements that Curo Holdings owed to White and Kumar. It stated: "To determine the amount of advancements presently due and to address advancement requests on an ongoing basis, the parties shall follow the [Fitracks Procedures]." *Id.* ¶ 11. The court directed that "[f]or purposes of the [Fitracks Procedures], the currently outstanding demands shall be treated as having been submitted on October 1, 2016." *Id.*

The Fitracks Procedures contemplate the following steps:

3

1.  Before the 10th calendar day of each month, counsel to the party seeking advancements (the "Covered Person") must submit an advancement demand for fees and expenses incurred during the previous month. Any fees or expenses not included in the demand are deemed waived. The advancement demand must include the following:

    a.  A detailed invoice identifying the fees and expenses for which advancement is sought. The invoice must provide for each time entry the date, timekeeper, billing rate, task description, time incurred, and amount charged. The invoice must provide for each expense the date of the charge, its nature, and the amount incurred.

    b.  A certification signed by the most senior member of the Delaware bar ("Responsible Delaware Counsel") representing the Covered Person. The certification must include a representation that Responsible Delaware Counsel for the Covered Person personally reviewed the invoice and determined in her good faith professional judgment that (i) each time entry and expense falls within the scope of the client's advancement right, (ii) the fees and expenses charged are reasonable in light of the factors listed in Rule 1.5(a), and (iii) the services rendered were thought prudent and appropriate.

2.  Before the 20th calendar day of the month, counsel to the party obligated to pay advancements (the "Advancing Party") must respond to the advancement demand in writing. The response must identify each specific time entry or expense to which the Advancing Party objects and explain the nature of the objection. The response must include a certification signed by Responsible Delaware Counsel for the Advancing Party. The certification must include a representation that Responsible Delaware Counsel for the Advancing Party personally reviewed the advancement demand and determined in her good faith professional judgment that the disputed fees and expenses are not reasonable or otherwise fall outside the scope of the Covered Person's advancement right. The response must cite any legal authority on which the Advancing Party relies. Any objection not included in the response is deemed waived.

3.  The Advancing Party must pay the undisputed amount contemporaneously with the response. If the Advancing Party disputes more than 50% of the amount sought in an advancement demand, then the Advancing Party must pay 50% of the amount sought, and the Covered Person's Delaware counsel must hold the portion exceeding the undisputed amount in its escrow account pending resolution of the dispute over that portion.

4.  Before the 25th calendar day of each month, the Covered Person's counsel must reply to the advancement response in writing and provide supporting information and authority.

5. Before the last calendar day of the month, the Responsible Delaware Counsel for each side must meet, in person, and confer regarding any disputed amounts. Any additional advancement that results from the meet-and-confer session must be paid with the next month's payment of undisputed amounts.

6. Not more frequently than quarterly, the Covered Person may file an application pursuant to Court of Chancery Rule 88 seeking a ruling on the disputed amounts. Briefing shall consist of a motion, an opposition filed within fifteen days of the motion, and a reply filed within ten days of the opposition. A party may not raise any new arguments not previously raised with the other side in the applicable demand, response, reply, or meet-and-confer. The parties may only cite authorities identified in writing in the applicable demand, response, or reply. The court will determine if a hearing is warranted.

7. If the court grants an application in whole or part, then pre-judgment interest is due on the adjudicated amount from the date of the applicable advancement demand. In addition, in parallel with the next advancement demand, the Covered Person may demand indemnification for the fees and expenses incurred in connection with the granted application, proportionate to the extent of success achieved. The parties shall address the indemnification demand in the same manner as the advancement demand. Except in connection with a successful application, the Covered Person may not seek or receive advancement or indemnification for time spent preparing invoices and advancement demands, addressing responses, or conferring regarding advancement requests.

*See generally Fitracks II*, 58 A.3d at 1002–04.

White and Kumar's demands for advancement totaled $5,121,651.73. They encompassed invoices from the following five law firms:

- S. Michael McColloch, PLLC, who represented White in the Brown Action, the Qui Tam Action, and the Government Investigation;

- Karen Cook, PLLC, who also represented White in the Brown Action, the Qui Tam Action, and the Government Investigation;

- The Law Offices of Dan C. Guthrie, Jr., Esq., who represented Kumar in the Brown Action, the Qui Tam Action, and the Government Investigation;

- Duane Morris LLP, who represented entities controlled by White and Kumar and relatives of White and Kumar in connection with the Qui Tam Action, then began representing Kumar on February 24, 2016; and

- Hunton & Williams LLP ("Hunton"), who represented Be Gentle HomeHealth Inc. ("Be Gentle") in connection with the Qui Tam Action and the Government Investigation.

They also included amounts that the McColloch firm paid as out-of-pocket expenses to a sixth law firm, Stanton Law Firm PC, who represented White and Kumar during the Brown Action.

As contemplated by the Fitracks Procedures, White and Kumar's Responsible Delaware Counsel provided the requisite certification. White and Kumar also submitted supporting certifications from S. Michael McColloch, Karen Cook, and Dan Guthrie.

Curo Holdings agreed to advance $858,898.20. Curo Holdings otherwise rejected the demands. This response violated the Fitracks Procedures, which required Curo Holdings to advance at least half of the amount sought, with White and Kumar's Delaware counsel holding in escrow the portion that exceeded the undisputed amount.

After reviewing Curo Holdings' objections, White and Kumar reduced their demand by $8,430.50 to account for clerical errors that Curo Holdings had identified. After conferring with Curo Holdings, White and Kumar also agreed to produce separate invoices for expenses incurred in connection with the Brown Action, the Qui Tam Action, and the Government Investigation. The production did not satisfy Curo Holdings, which continued to object to the amounts sought.

As contemplated by the Fitracks Procedures, White and Kumar filed this motion pursuant to Court of Chancery Rule 88. In total, Curo Holdings withheld $4,262,753.53, or 83.2%, of the amount sought. White and Kumar seek immediate payment of the amount withheld, plus interest.

6

## II.    LEGAL ANALYSIS

The party seeking advancement "bears the burden of justifying" the amounts sought.

*Citadel Hldg. Corp. v. Roven*, 603 A.2d 818 823–24 (Del. 1992). Rule 88 provides that

> [i]n every case in which an application to the court is made for a fee or for reimbursement for expenses or services[,] the Court shall require the applicant to make an affidavit or submit a letter, as the Court may direct, itemizing (1) the amount which has been received, or will be received, for that purpose from any source, and (2) the expenses incurred and services rendered, before making such an allowance. . . .

Ct. Ch. R. 88. The court has discretion in determining the extent of the submissions required under Rule 88. *Cohen v. Cohen*, 269 A.2d 205, 207 (Del. 1970). In the Entitlement Order, this court determined that the submissions should comply with the Fitracks Procedures.

Advancement is a form of contractual fee-shifting. *See Fitracks II*, 58 A.2d at 997. When determining a reasonable amount under a contractual provision, the Delaware Supreme Court has instructed the trial courts "to consider the factors set forth in the Delaware Lawyers' Rules of Professional Conduct." *Mahani v. EDIX Media Gp., Inc.*, 935 A.2d 242, 245–46 (Del. 2007). They are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;

7

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Del. Lawyers' R. Prof'l Conduct 1.5(a). The *Mahani* decision also instructed trial courts to consider "whether the number of hours devoted to litigation was excessive, redundant, duplicative or otherwise unnecessary." 935 A.2d at 247–48 (internal quotation marks omitted). These factors provide the framework for evaluating the reasonableness of the amounts for which advancement is sought. *Fitracks II*, 58 A.3d at 996–97; *accord Tafeen v. Homestore, Inc.*, 2005 WL 789065, at *2 (Del. Ch. Mar. 29, 2005) (using the Rule 1.5(a) factors when evaluating the reasonableness of an advancement request), *aff'd*, 888 A.2d 204 (Del. 2005).

Determining the reasonableness of the amounts sought, however, "does not require that this Court examine individually each time entry and disbursement." *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010); *accord Blank Rome, LLP v. Vendel*, 2003 WL 21801179, at *8–10 (Del. Ch. Aug. 5, 2003) (rejecting alleged requirement of line-item review). Analyzing specific invoices typically "would neither be useful nor practicable." *Weichert Co. of Pa. v. Young*, 2008 WL 1914309, at *2 (Del. Ch. May 1, 2008). "[A]n arm's-length agreement, particularly with a sophisticated client, . . . can provide an initial 'rough cut' of a commercially reasonable fee." *Wis. Inv. Bd. v. Bartlett*, 2002 WL 568417, at *6 (Del. Ch. Apr. 9, 2002), *aff'd*, 808 A.2d 1205 (Del. 2002). If a party cannot be certain that it will be able to shift expenses at the time the expenses are incurred, the prospect that the party will bear its own expenses provides "sufficient

8

incentive to monitor its counsel's work and ensure that counsel [does] not engage in excessive or unnecessary efforts." *Aveta*, 2010 WL 3221823, at *6; *accord Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1998 WL 155550, at *2 (Del. Ch. Mar. 30, 1998) (considering when evaluating reasonableness that client faced prospect of bearing full cost of litigation), *aff'd*, 720 A.2d 542 (Del. 1998).

"Determining reasonableness of amounts sought also does not require the Court to assess independently whether counsel appropriately pursued and charged for a particular motion, line of argument, area of discovery, or other litigation tactic." *Fitracks II*, 58 A.3d at 997. "For a Court to second-guess, on a hindsight basis, an attorney's judgment . . . is hazardous and should whenever possible be avoided." *Arbitrium*, 1998 WL 155550, at *4. A party's expenses are reasonable if they were "actually paid or incurred[,] . . . were . . . thought prudent and appropriate in the good faith professional judgment of competent counsel[,] and were charge[d] . . . at rates, or on a basis, charged to others for the same or comparable services under comparable circumstances." *Delphi Easter P'rs Ltd. P'ship v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *9 (Del. Ch. Aug. 6, 1993).

When reviewing amounts submitted for advancement, the summary nature of an advancement proceeding further counsels against granular review. "[D]etailed analysis . . . is both premature and inconsistent with the purpose of a summary [advancement] proceeding." *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 510 (Del. 2005). "The function of a § 145(k) advancement case is not to inject this court as a monthly monitor of the precision and integrity of advancement requests." *Fasciana v. Electronic Data Sys. Corp.* (*Fasciana I*), 829 A.2d 160, 177 (Del. Ch. 2003) (Strine, V.C.). Consequently, the advancement stage

9

"is not the proper stage for a detailed analytical review of the fees, whether in terms of the strategy followed or the staffing and time committed." *Duthie v. CorSolutions Med., Inc.*, 2008 WL 4173850, at *2 (Del. Ch. Sept. 10, 2008). Nor is it a vehicle for a party that committed to provide advancements to manufacture "persnickety disputes over the reasonableness of the attorneys' fees sought." *Blankenship v. Alpha Appalachia Hldgs., Inc.*, 2015 WL 3408255, at *28 (Del. Ch. May 28, 2015). "Unless some gross problem arises, a balance of fairness and efficiency concerns . . . counsel[s] deferring fights about details until a final indemnification proceeding." *Fasciana I*, 829 A.2d at 177; *see Reinhard & Kreinberg v. Dow Chem. Co.*, 2008 WL 868108, at *5 (Del. Ch. Mar. 28, 2008) ("[T]his Court does not relish and will not perform the task of playground monitor, refereeing needless and inefficient skirmishes in the sandbox [over advancements].").

Curo Holdings leveled a vast array of objections against an overwhelming number of entries that White and Kumar's counsel certified as qualifying for advancement. This decision groups them into three categories.

The first category encompasses objections to expenses that fall within the scope of White and Kumar's advancement right. These objections contest the form of White and Kumar's submissions or assert that the amounts are unreasonable or duplicative.

The second category encompasses objections about whether expenses fall within the scope of White and Kumar's advancement right. One objection contests whether expenses incurred on behalf of other parties to the Qui Tam Action or targets in the Government Investigation are subject to advancement. Another contests whether expenses that bear some relationship to the Brown Action are subject to advancement. A third

10

contests whether the defense of issues in the Qui Tam Action and Government Investigation that relate to White and Kumar's home healthcare businesses are subject to advancement.

The third category consists of a single objection: Curo Holdings claims that a monetary cap found in the deal-related indemnification provisions in Article IX of the Texas Purchase Agreement imposes a ceiling on the amount of advancement that White and Kumar can recover. Through this objection, Curo Holdings advances in a new guise the same argument that this court rejected in the Rule 12(b)(6) Decision, namely that deal-related indemnification provisions in the Texas Purchase Agreement trump the personal indemnification rights set out in Section 8.03 of the agreement.

## A. Objections To The Form And Amount Of Expenses Falling Within The Scope Of The Advancement Right

The first category of objections focuses on the form of White and Kumar's submissions and the reasonableness of particular expenses. Contrary to the teachings of cases like *Aveta*, *Arbitrium*, *Bartlett*, *Blank Rome*, *Blankenship*, *Duthie*, *Kaung*, *Fasciana I*, *Fitracks II*, and *Weichert*, Curo Holdings seeks to litigate the particular details of individual expenses. None of these objections has merit.

### 1. Entries That Allegedly Lack Sufficient Detail

Curo Holdings objects to at least 667 billing entries as purportedly lacking sufficient detail to enable Curo Holdings to determine whether White and Kumar incurred the expenses in connection with a covered proceeding. To the contrary, White and Kumar's invoices provide sufficient detail about the nature of the work performed. This is

11

particularly so when the invoices are reviewed as a whole, because the narrative account clearly demonstrates what White and Kumar's lawyers were doing on behalf of their clients. In light of this fact and the certification provided by White and Kumar's Responsible Delaware Counsel, this objection should not have been made.

Curo Holdings also objects in full to over 93% of the billing entries that contain any redactions. This objection is unfounded. Most of the redactions are minimal and consist of an isolated word or name. When the invoices and entries are read as a whole, the narrative supplies the necessary context and confirms that the expenses are subject to advancement. Here, too, the objection should not have been made.

That said, the redactions did reduce the informational content of the invoices, and this issue could give rise to additional disputes in the future if White and Kumar were to begin making more extensive redactions. In my experience, redaction of invoices is rarely warranted. Parties seeking to redact items routinely advance the argument that producing unredacted invoices will waive privilege, but the descriptions on invoices are invariably so general that they would not result in a waiver. Parties also argue that unredacted invoices would reveal litigation strategy, but the generalized descriptions rarely reveal anything. Moreover, although this may come as a shock to some lawyers, the other side usually perceives and understands its opponent's legal strategy quite well. Particular details might stay secret, such as the identity of an expert or the specific questions to be asked in

deposition or on cross examination, but parties inevitably make their positions, strategies, claims, and defenses known through the course of a case.[2]

In this case, as in most cases, the need for redacting invoices is overblown. The court has entered a two-tiered confidentiality stipulation, which provides sufficient protection to obviate the need to redact invoices. Going forward, White and Kumar shall provide unredacted invoices to Curo Holdings. If White and Kumar believe it is necessary to redact a particular category of items, they first must apply to the court and establish good cause for doing so.

### 2. Entries That Are Allegedly Unreasonable, Unnecessary, Or Duplicative

Curo Holdings objects to numerous entries because they allegedly were "unreasonable in amount, describe work that was not reasonably necessary, or . . . are duplicative." Dkt. 57, Ex. E (the "Objections") ¶ 29. As previously noted, "[a]dvancement is not the proper stage for a detailed analytical review of the fees, whether in terms of the

---

[2] Indeed, one of the central purposes of discovery is to enable a party to determine what positions the other side is taking. *See, e.g.*, *Levy v. Stern*, 687 A.2d 573, 1996 WL 742818, at *2 (Del. Dec. 20, 1996) (ORDER) (explaining that the Delaware Supreme Court "has long recognized that the purpose[s] of discovery [are] to advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial"); *Hoey v. Hawkins*, 332 A.2d 403, 405 (Del. 1975) (citing the "well established policy of pretrial disclosure which is based on a rationale that a trial decision should result from a disinterested search for truth from all the available evidence rather than tactical maneuvers based on the calculated manipulation of evidence and its production" (internal quotation marks omitted)); *Empire Box Corp. v. Ill. Cereal Mills*, 90 A.2d 672, 678 (Del. Super. 1952) ("The underlying purpose of discovery in general is to reduce the element of surprise at trial by advancing the time at which disclosure can be ordered from the trial date to a date preceding that date.").

strategy followed or the staffing and time committed." *Duthie*, 2008 WL 4173850, at *2. The certification from Responsible Delaware Counsel is sufficient at this stage, absent clear abuse.

Curo Holdings has not established anything close to clear abuse. For example, Curo Holdings complains that White and Kumar's attorneys reviewed documents that were responsive to subpoenas served on White and Kumar's entities, even though White and Kumar were not served personally with subpoenas until months later. This was entirely reasonable, as the subpoenas obviously threated White and Kumar with an investigation.

Curo Holdings did identify one item that appears to be a calculation error. On one invoice, Cook billed 33.80 hours and her paralegal billed 2.80 hours, but Cook submitted a bill for $21,605, which is her hourly rate multiplied by all 36.60 hours. White and Kumar already deducted the additional $8,430.50 that this error produced.

It is legitimate and reasonable for Curo Holdings to review invoices for errors like the apparent mistake on Cook's invoice. It is improper and unreasonable for Curo Holdings to second-guess the judgment of White and Kumar's lawyers and the certification by Responsible Delaware Counsel.

### 3. The Demand For A Budget and Work Plan

Turning its backward-looking second-guessing into forward-looking micro-management, Curo Holdings insists that White and Kumar provide a work plan for their counsel and an associated budget as conditions to receiving advancements in the future. According to Curo Holdings,

14

> Curo typically requires law firms to provide a budget and a work plan so that Curo can reduce costs and ensure that work is necessary and reasonable under the circumstances. Neither White nor Kumar has submitted any such information to Curo and therefore Curo objects to paying the invoices on that basis. Going forward, Curo requests that White and Kumar provide such information in accordance with Curo's typical practices.

Objections ¶ 38.

Advancement is a contractual right governed by the terms of the operative agreement. When a company has provided a covered person with a mandatory advancement right conditioned only on an undertaking to pay, the company "does not have the right to impose any terms or conditions on . . . advancement other than an undertaking to repay." *Blankenship*, 2015 WL 3408255, at *26. A corporation cannot, for example, require that the covered person insist on "proof of an ability to repay, or even the posting of a secured bond." *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *4 (Del. Ch. June 18, 2002) (Strine, V.C.); *accord In re Cent. Banking Sys., Inc.*, 1993 WL 183692, at *4 (Del. Ch. May 11, 1993) ("The only condition imposed by the By-laws is that the recipient furnish an undertaking to repay the amounts advanced . . . . That condition has been satisfied. Neither that provision nor any provision of Delaware law requires that the undertaking be secured or be accomplished by a showing of the indemnitee's financial responsibility.").

The mandatory advancement right that Curo Holdings granted to White and Kumar requires only the submission of an undertaking to repay. TPA § 8.03(a). Curo Holdings cannot now build in other obligations, such as an obligation to provide a work plan and budget. Curo Holdings could have chosen not to grant White and Kumar any right to

15

advancement. Curo Holdings also could have built conditions and limitations into the advancement right, including the need for a budget and a work plan. What Curo Holdings cannot do now is retrospectively revise the advancement right to insert conditions and limitations that are not part of the contract.

### 4. The Adequacy Of The Attorney Certifications

In another objection to form, Curo Holdings contends that White and Kumar cannot recover expenses for any law firm that did not provide a "sworn declaration attesting that their fees and expenses are properly subject to advancement or are reasonable in amount." Objections ¶ 11. The Fitracks Procedures require a "certification signed by the senior member of the Delaware bar representing [White and Kumar] attesting that ... he personally reviewed the invoice[s]" submitted for advancement. *Fitracks II*, 58 A.3d at 1003. They also call for the parties to submit any remaining disputes through a motion pursuant to Rule 88, which requires that the movant provide "an affidavit . . . itemizing (1) the amount which has been received, or will be received, for that purpose from any source, and (2) the expenses incurred and services rendered, before making such an allowance." Ct. Ch. R. 88.

White and Kumar satisfied the Fitracks Procedures by providing the requisite certifications. They also provided certifications and affidavits from other counsel to support their Rule 88 motion. They do not need to provide any additional declarations or certifications. Curo Holdings' objection on this point is meritless.

16

### 5. Miscellaneous Entries

In a final catch-all objection, Curo Holdings asserts that White and Kumar's invoices "include numerous miscellaneous entries associated with matters that are beyond the scope of any potential advancement right." Objections ¶ 36. "Advancement is not the proper stage for a detailed analytical review of the fees, whether in terms of the strategy followed or the staffing and time committed." *Duthie*, 2008 WL 4173850, at *2. Through the Fitracks Procedures, counsel for White and Kumar explained why they needed to undertake each of the miscellaneous activities that Curo Holdings cited. Responsible Delaware Counsel certified that the expenses were subject to advancement. That is sufficient at this stage of the case.

### B. Objections About Expenses Allegedly Falling Outside The Scope Of The Advancement Right

Curo Holdings' next category of objections asserts that certain expenses fall outside the scope of the advancement right that White and Kumar possess. One of the objections in this category has merit.

### 1. Expenses Incurred On Behalf Of Other Entities

Curo Holdings asserts that it should not have to advance expenses for Hunton and Duane Morris because those firms represented parties other than White and Kumar. Curo Holdings is correct. The other parties are not covered by the advancement right, so the expenses incurred representing those parties are not subject to advancement.

Although Delaware has a strong public policy in favor of advancement rights, that policy "does not trump basic principles of contract interpretation." *Majkowski v. Am.*

*Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 592–93 (Del. Ch. 2006) (Strine, V.C.) (internal quotation marks and citation omitted). When an advancement provision unambiguously fails to extend rights to a particular person, that person is not entitled to advancements. *See, e.g., Flynn v. CIBC World Mkts. Corp.*, 2005 WL 1538337, at *1 (Del. Ch. June 21, 2005). The same principle holds in the distinct but analogous area of insurance law. Like advancement rights, public policy calls for insurance contracts to be "construed against [the] insurer." 3d Steven Plitt et al., *Couch on Insurance* § 22.1, at 22-5 (West 2015). Nevertheless, the only persons who can recover under an insurance policy are those identified as insureds in the agreement.[3]

The advancement right under the Texas Purchase Agreement extended to "each present (as of immediately prior to the Closing) and former officer and director of [Texas

---

[3] *Shuba v. United Servs. Auto. Ass'n*, 77 A.3d 945, 948–50 (Del. 2013); *accord, e.g., Graves & Barnewall v. Boston Marine Ins. Co.*, 6 U.S. 419, 419 (2 Cranch) (1805) ("A policy in the name of one joint owner, 'as property may appear,' (without the clause stating the insurance to be for the benefit of all concerned) does not cover the interest of another joint owner."); *Willamette Navigation Co. v. Hartford Fire Ins. Co.*, 287 F. 464, 467 (9th Cir. 1923) ("The general rule is that a policy made in the name of a particular person will not protect the interest of any other person, unless the words 'for whom it may concern' or their equivalent indicate that it is intended that the interest of some other person be covered." (citation omitted)); *Finney v. Bedford Commercial Ins. Co.*, 42 Mass. 348, 350–51 (8 Met.) (Mass. Oct. 1, 1844) (holding that where an insurance contract plainly identifies the party or parties to be insured, parole evidence cannot be introduced to extend insurance coverage to other parties in interest). For example, "[i]f a policy of insurance names only one spouse as the insured, coverage does not automatically extend to the other spouse by virtue of their marital relationship." Plitt, *supra*, § 40:8, at 40-13 (collecting cases).

Hospice] or any of its Subsidiaries or the Seller [sic]."[4] It therefore covered White and Kumar, who at the time of closing were officers and directors of Texas Hospice and many of its Subsidiaries.

Hunton represented Be Gentle. Ciarrocki Aff., Exs. C, D & E. Be Gentle was not a present or former officer or director of Texas Hospice or any of its Subsidiaries. Be Gentle is therefore not entitled to advancements.

To justify seeking advancement for expenses incurred by Hunton, White and Kumar argue that Be Gentle needed counsel, that it was a defunct shell corporation they controlled, and that it was therefore logical for them to retain counsel for Be Gentle at their expense. White and Kumar contend that by representing Be Gentle, Hunton gained insight into the government's strategy in the Qui Tam Action and the Government Investigation, which White and Kumar otherwise may not have obtained. White and Kumar reason that because their retention of counsel for Be Gentle helped them defend against the Government Investigation and Qui Tam Action, the expenses they incurred to pay Hunton are subject to advancement.

But that is not how the advancement right works. The question in the first instance is whether a covered person incurred the expenses. Be Gentle is not a covered person, so its expenses are not subject to advancement. Because the analysis never clears the first step,

---

[4] TPA § 8.03(a). As noted in the Rule 12(b)(6) Decision, the references to "the Seller" appears to be a drafting error introduced when the provision was carried over from the Curo Purchase Agreement. 2016 WL 6091692, at *18 n.20.

19

it never reaches the question of whether the expenses were incurred in defending against a covered proceeding.

The same analysis applies to the majority of the expenses incurred by Duane Morris. Duane Morris represented Goodwin Home Healthcare Services, Inc., North Texas Best Home Healthcare, Inc., and certain relatives of Kumar. The firm never represented White, and it only began representing Kumar on February 24, 2016, when it entered an appearance for Kumar in the Qui Tam Action. *See United States ex rel. Capshaw, et al. v. White, et al.*, C.A. No. 3-12-cv-4457N (N.D. Tex.), Dkts. 151 & 152. As with Hunton, White and Kumar contend that these entities and relatives were targeted in the Qui Tam Action and the Government Investigation, that they needed counsel, and that funding counsel for them was therefore a necessary part of their defense against the Qui Tam Action and the Government Investigation. Again, the threshold problem is that none of these entities or individuals are covered persons, and so the expenses that White and Kumar paid to Duane Morris on their behalf fall outside the scope of the advancement right.

The analysis changes after February 24, 2016, when Kumar retained Duane Morris. When a covered person defends a proceeding with other non-covered persons, he can only recover expenses that he necessary would have incurred himself:

> If a particular defense or litigation activity benefits multiple third-party defendants, but [the party entitled to advancement] would have raised or undertaken it himself if he were the sold third-party defendant, then [the respondent] must advance 100% of the related fees and expenses. By contrast, if a particular defense or litigation activity only partially benefits [the party entitled to advancement], then counsel must make a good faith allocation of the amount of fees and expenses that [the party entitled to advancement] would have incurred if he were the sold third-party defendant. If a defense or litigation activity only benefits third-party defendants other

20

than [the party entitled to advancement], then obviously [the respondent] need not advance the related fees and expenses.

*Danenberg v. Fitracks, Inc.* (*Fitracks I*), 2012 WL 11220, at *7 (Del. Ch. Jan. 3, 2012). It does not appear that White and Kumar allocated Duane Morris's expenses in accordance with this principle. Many of the entries that post-date February 24 involve work performed on behalf of other entities and individuals. *See, e.g., id.* dkts. 166–69 (motions to dismiss filed by Duane Morris on behalf of One Point Home Health Services LLC and Phoenix Hospice Inc.); *id.* dkt. 194 (motion to extend time filed by Duane Morris on behalf of Goodwin Home Health Services Inc., North Texas Best Home Healthcare, Inc., Vinayaka Associates LLC, Kumar's relatives, and Kumar himself). After Duane Morris makes a proper allocation, Kumar may resubmit the expenses under the Fitracks Procedures

Finally, McColloch's invoices identify as out-of-pocket expenses payments made to Hunton. *See, e.g.*, Ciarrocki Aff., Ex. E, at 120, 122, 142, and 144 of 255 (Invoices dated 1/29/2015, 2/19/2015, 3/4/2016, and 4/29/2016). McColloch represented White, but White cannot bring non-covered expenses within the scope of his advancement right simply by having his own lawyer act as a paying agent. These amounts are not subject to advancement.

## 2. Expenses Incurred In Connection With The Brown Action

Curo Holdings also asserts that White and Kumar have sought advancement for expenses incurred in defending the Brown Action, in violation of this court's previous determination that White and Kumar gave up their advancement and indemnification rights for that proceeding as part of a settlement. White and Kumar respond that because the

21

Brown Action post-dated the initiation of the Government Investigation, their lawyers worked with individuals involved in the Brown Action, reviewed documents obtained in the Brown Action, attended depositions, and performed other tasks as part of defending against the Government Investigation.

"[I]n actions where only certain claims are advanceable, the Court generally will not determine at the advancement stage whether fee requests relate to covered claims or excluded claims, unless such discerning review can be done realistically without significant burden on the Court." *Holley v. Nipro Diagnostics, Inc.* (*Holley II*), 2015 WL 4880418, at *1 (Del. Ch. Aug. 14, 2015) (emphasis omitted); *accord Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 408 (Del. Ch. 2009). "If fees cannot be apportioned with rough precision between advanceable claims and non-advanceable claims, or the work was useful for both sets of claims, then the fees will be advanced in whole." *Holley II*, 2015 WL 4880418, at *1.

To determine whether expenses incurred defending both covered and non-covered proceedings are subject to advancement, the operative test is: "Would the [d]isputed [expenses] have been incurred in defense of the [covered proceeding] even if there was no [non-covered proceeding]? If the answer is yes, then the [d]isputed [expenses] are advanceable." *Holley II*, 2015 WL 4880418, at *2; *cf. Fitracks I*, 2012 WL 11220, at *7 (using similar test for covered parties). "If . . . the fee requests relate to *both* advanceable claims and non-advanceable claims, *i.e.*, the work is useful for both types of claims, that work is entirely advanceable if it would have been done independently of the existence of the non-advanceable claims." *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at

22

*6 (Del. Ch. May 28, 2015). "[A]ny doubts should be resolved in favor of advancement." *Id.*

Whether work would have been incurred in the absence of the non-covered proceeding frequently requires a degree of judgment. The "attorneys who coordinated [the] defense of the various actions are the most competent to opine as to what would have been required for the defense of the [covered proceeding], even if the [noncovered proceeding] did not exist." *Holley II*, 2015 WL 4880418, at *2. Absent "clear abuse," counsel's good faith certification is sufficient to support an award of advancements. *Duthie*, 2008 WL 4173850, at *2.

Curo Holdings objected to every entry that conceivably related to the Brown Action, even if the entry only made a passing reference to an individual or entity involved in that litigation. In response, McColloch provided an affidavit explaining why the invoice entries were necessary for the defense of the Government Investigation and the Qui Tam Action. McColloch certified that

> [t]he invoices submitted to Curo Holdings for advancement do not include any fees or expenses that would not have been incurred if the only claims at issue were claims brought against White in the Government Investigation and the Qui Tam Action by reason of his status as an officer or director of [Texas Hospice] or its subsidiaries.

Ciarrocki Aff., Ex. G, ¶ 26. White and Kumar also pointed out that McCulloch and Cook incurred over $1.3 million in fees for the Brown Action for which advancement has not been sought.

For purposes of this summary advancement proceeding, McColloch's certification is sufficient. A "discerning review" of these entries is not possible "without significant

23

burden on the Court." *Holley II*, 2015 WL 4880418, at \*1. Because White and Kumar's billing practices do not constitute "clear abuse," counsel's good faith certifications are enough. *Duthie*, 2008 WL 4173850, at \*2.

One exception applies. As he did with Hunton, McColloch recorded payments he made to the Stanton Law Firm as out-of-pocket expenses. *See, e.g.*, Ciarrocki Aff., Ex. E, at 111 (expenses for August 2016). Stanton represented White and Kumar in the Brown Action, but not in the Government Investigation or the Qui Tam Action. Stanton's expenses are not subject to advancement, and White and Kumar cannot make Stanton's expenses advanceable by having McCulloch front them.

### 3. Expenses Incurred Relating To The Home Health Businesses

Just as Curo Holdings argued that expenses bearing some connection to the Brown Action were not subject to advancement, Curo Holdings makes the same argument regarding expenses bearing some connection to White and Kumar's home health care business. White and Kumar historically operated both a home health care business and a hospice business. Through the Curo Acquisition and the related Texas Minority Acquisition, the current owners of Curo Holdings acquired the hospice business. Curo Holdings now contends that the advancement right granted to White and Kumar under Section 8.03 of the Texas Purchase Agreement extends only to their role as officers or directors of Texas Hospice and its Subsidiaries, which operated in the hospice business. They conclude that the advancement right does not extend to any activities involving the home healthcare business.

24

Assuming for the sake of argument that Curo Holdings is correct about the scope of the advancement right, that would not limit the ability of White and Kumar to seek advancements for the Government Investigation and the Qui Tam Action. "[I]f there is a nexus or causal connection between any of the underlying proceedings . . . and one's official corporate capacity, those proceedings are 'by reason of the fact' that one was a corporate officer." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 214 (Del. 2005). "In advancement cases, the line between being sued in [a non-covered] capacity and one's corporate capacity generally is drawn in favor of advancement with disputes as to the ultimate entitlement to retain the advanced funds being resolved later at the indemnification stage." *Holley v. Nipro Diagnostics, Inc.* (*Holley I*), 2014 WL 7336411, at *9 (Del. Ch. Dec. 23, 2014).

> Deferring resolution of less clear-cut disputes to the indemnification stage helps avoid excessive litigation over advancement. In addition to saddling the parties with unnecessary costs, litigation-related delays over advancement threaten to undermine the summary nature of the proceedings envisioned by 8 *Del. C.* [§] 145, as well as the policy of providing prompt reimbursement to present and former directors and officers who have had to incur attorneys' fees and related expenses.

*Mooney*, 2015 WL 3413272, at *8.

Under this standard, Delaware courts will defer a capacity determination "unless the answer can be discerned swiftly, accurately, and consistent with the summary nature of an advancement proceeding." *Id.* When there is no clear demarcation between covered and non-covered claims, the court again will err on the side of advancement. *Compare id.* at *7 (declining to parse between advanceable and non-advanceable claims where there was "no such clear demarcation"), *and Fitracks I*, 2012 WL 11220, at *6 (awarding advancement

25

because "[i]t is not possible at this stage to parse between pre- and post-merger representations or among causes of action such that a lesser allocation would be appropriate"), *with Xu Hong Bin v. Heckmann Corp.*, 2010 WL 187018, at *2 (Del. Ch. Jan. 8, 2010) (denying advancement from a selling corporation where its former director incurred expenses defending claims arising out of his non-covered, post-merger conduct).

Both the Government Investigation and the Qui Tam Action assert that White and Kumar used their corporate powers to enmesh their hospice and home health care entities in a web of relationships. Through these relationships, White and Kumar allegedly provided kickbacks and referrals in violation of federal law. It is not possible at this stage to separate the allegations relating to the hospice businesses from the allegations relating to the home health care business, nor to carve out either from the larger conspiracy. Because of the nature of the claims being advanced in the Government Investigation and the Qui Tam Action, White and Kumar are entitled to advancements for those proceedings as a whole. This court previously made that determination in the Entitlement Order when it held that White and Kumar were entitled to advancement for the Government Investigation and the Qui Tam Action. Curo Holdings did not advance any reason why it should be able to re-litigate that issue.

## C.    The Cap Argument

In a final argument, Curo Holdings posits that its liability for advancements is capped at $858,898.20. To get there, Curo Holdings relies on Section 9.03(d) of the Texas Purchase Agreement, which imposes a maximum cap on the amount of deal-related indemnification that White and Kumar can recover from Curo Holdings for breaches of the

Texas Purchase Agreement. Curo Holdings recasts its failure to provide the advancement as a breach of the Texas Purchase Agreement that gives rise to a claim for damages, points out that indemnification is the exclusive remedy for breaches of the Texas Purchase Agreement, and concludes that the damages cap in Section 9.03(d) limits its obligation to pay advancements. The parties refer to this position as the "Cap Argument." This decision rejects the Cap Argument as a matter of law.

In Section 8.03(a), Curo Holdings granted White, Kumar, and the other Indemnified Persons a direct right to advancements from Curo Holdings. The relevant language states:

> In the event of any such claim, action, suit, proceeding or investigation, each Indemnified Person will be entitled to advancement of expenses incurred in the defense of any claim, action, suit, proceeding or investigation from [Curo Holdings] within ten (10) Business Days of receipt by [Curo Holdings] from the Indemnified Person of a request therefor; provided that any person to whom expenses are advanced provides an undertaking, if and only to the extent required by the certificate of incorporation, bylaws, limited liability company agreement or operating agreement (or equivalent organizational documents) of [Texas Hospice] or any of its Subsidiaries, as applicable.

TPA § 8.03(a).

Section 8.03 appears in Article VIII of the Texas Purchase Agreement, which is titled "Covenants of [Curo Holdings]." Curo Holdings argues that because Section 8.03 is a covenant, Section 9.03(a) comes into play. That section states:

> From and after the Texas Closing (but subject to the provisions of this Article IX), [Curo Holdings] shall indemnify the Seller Parties and hold them harmless against any Losses to the extent arising out of, resulting from or relating to:
>
> (i) any breach of any representation or warranty of [Curo Holdings] under this Agreement or any certificate declared hereunder . . . and

(ii) any breach **of any covenant** or agreement in this Agreement by [Curo Holdings] or, after the Texas Closing, [Texas Hospice] and its Subsidiaries.

TPA § 9.03(a) (formatting and emphasis added). Section 9.03(d) provides that "[n]otwithstanding the foregoing, in no event shall [Curo Holdings] be obligated to pay to the Seller Parties pursuant to this Section 9.03 an amount in excess of the Curo Texas Escrow Amount." TPA § 9.03(d). Curo Holdings calculates that the Curo Texas Escrow Amount is $858,898.20—roughly 17% of White and Kumar's requested amount. Curo Texas concludes that it cannot be obligated to advance them more than $858,898.20.

To construct the Cap Argument, Curo Holdings must read Section 9.03(d) in isolation and ignore the overall structure of the Texas Purchase Agreement. Curo Holdings took the same approach in construing the sixteen-word Parenthetical Limitation that prompted the Rule 12(b)(6) Decision. *See* 2016 WL 6091692, at *19. But when interpreting a contract governed by Delaware law, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "Moreover, the meaning which arises from a particular portion of an agreement cannot

28

control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

There are serial problems with the Cap Argument. First, it is important to recognize that Section 9.03(a) appears in Article IX of the Texas Purchase Agreement, which is the section that addresses "deal-related indemnification." 2016 WL 6091692, at *1. The deal-related indemnification provisions in Article IX are fundamentally different than and distinct from the personal indemnification provisions in Section 8.03. *See id.* at *16–17. This court already held in the Rule 12(b)(6) Decision that the limitations on recovery that apply to the deal-related indemnification structure, including the Deductible, Mini-Basket, and Cap, do not apply to claims for personal indemnification under Section 8.03. *See id.* at *26–27. The Rule 12(b)(6) Decision already rejected the linkage on which Curo Holdings again relies.

Second, when read within the structure of the Texas Purchase Agreement as a whole, the obvious purpose of Section 9.03(a) is to provide a monetary remedy for commitments under the Texas Purchase Agreement *other than commitments to pay sums of money set forth in other sections of the Texas Purchase Agreement*. For example, Article I of the Texas Purchase Agreement contains provisions in which Curo Holdings agreed to (i) pay the Base Consideration, (ii) pay the Additional Consideration, and, if necessary, (iii) pay post-closing adjustments in accordance with its percentage ownership of Texas

29

Hospice. *See* TPA §§ 1.02, 1.05. If Curo Holdings' position on advancements were correct, then by parity of reasoning, Curo Holdings could have refused to make the payments contemplated by these provisions and had its liability capped at $858,898.20. The payment provisions in Article I are agreements found in the Texas Purchase Agreement, but the indemnification procedure in Section 9.03(a) and the cap in Section 9.03(d) obviously do not apply to them. The same is true for the commitment to provide advancements in Section 8.03.

Third, when read in conjunction with the Curo Purchase Agreement, which is the overarching transaction document, the provisions that make deal-related indemnification the exclusive remedy for breaches of contract carve out other payment provisions like Section 8.03(a). *See* CPA § 9.08; TPA § 9.08. As discussed in the Rule 12(b)(6) Decision, the Curo Purchase Agreement and the Texas Purchase Agreement "were drafted in parallel and designed to work together, and the Texas Minority Acquisition is part of the overall Curo Acquisition." 2016 WL 6091692, at *10.

> From the standpoint of the owners of Texas Hospice, the deal was supposed to work as if the two steps were a unitary transaction. The sellers of the 20% minority would receive base consideration equal to 20% of the base consideration paid by CH Acquisition to Ultimate Parent, they would receive 20% of the benefit and bear 20% of the cost of any post-closing adjustments, and they would bear 20% of the cost of any deal-related indemnification owed to CH Acquisition. The parallelism carried over to the portion of the deal consideration that would be set aside to fund any indemnification obligations owed to CH Acquisition.

*Id.* at *5. The same is true for the personal indemnification provisions, where "Section 8.03 of the Texas Purchase Agreement closely resembles Section 8.03 of the Curo Purchase Agreement." *Id.* at *16. The Rule 12(b)(6) Decision relied on the interlocking structure of

30

the two agreements by reading the No Circular Recovery provision in Section 9.09 of the Curo Purchase Agreement to shed light on Section 9.09 of the Texas Purchase Agreement. *See id.* at *25.

The same principles apply to the exclusive remedy provision on which Curo Holdings relies for the Cap Argument. Titled "Exclusive Remedy," Section 9.08 of the Texas Purchase Agreement provides as follows:

> (a) Each of the parties acknowledges and agrees that from and after the Texas Closing, its sole and exclusive remedy with respect to any and all claims relating, directly or indirectly, to the subject matter of this Agreement or the transactions contemplated hereby, regardless of the legal theory under which such liability or obligation may be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, shall be exclusively pursuant to the provisions set forth in Section 1.05, this Article IX, Section 10.01, Section 11.02, and Section 13.18, as applicable. In furtherance of the foregoing, each of the parties hereby waives, from and after the Texas Closing, to the fullest extent permitted under applicable Law, any and all other rights, claims and causes of action such party or any of its Affiliates may have against any other party relating (directly or indirectly) to the subject matter of this Agreement arising under or based upon any federal, state, local or foreign Law. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the Purchaser is not waiving any non-waivable rights or remedies under Delaware law as it exists as of the date hereof, including any such non-waivable rights and remedies with respect to fraud.

> (b) The parties hereto agree that the provisions in this Agreement relating to indemnification, and the limits imposed on remedies with respect to this Agreement and the transactions contemplated hereby (including Section 9.02 and this Section 9.08), constitute an integral part of the consideration given to the Sellers, were specifically bargained for between sophisticated parties and were specifically taken into account in the determination of the amounts to be paid to the Sellers hereunder.

TPA § 9.08. Notably, Section 9.08(a) states that the provisions in Article IX constitute one part of the parties' exclusive remedy, which also comprises other provisions. In the Texas

31

Purchase Agreement, the list of provisions does not identify Section 8.03, but in the more thoroughly worked Curo Purchase Agreement, the comparable provision does call out Section 8.03. *See* CPA § 9.08(a). The parties plainly intended to exclude the provisions that created direct payment rights from Section 9.08 of both agreements, but in the shorter-form agreement used for the Texas Minority Acquisition, they omitted an explicit reference to Section 8.03. When the Transaction Agreements are read as a whole, it is not reasonable to read that dropped reference as an intentional omission.

Fourth, Curo Holdings' reading would have the unreasonable result of treating Indemnified Persons differently depending on whether or not they are Seller Parties. The deal-related indemnification provisions in Article IX place limitations on White and Kumar's ability to obtain indemnification in their capacity as Seller Parties. In Section 8.03, by contrast, White and Kumar receive an unlimited right to advancement in their capacity as Indemnified Persons. The latter category is broader than the former, with the scope of Indemnified Persons extending to "each present (as of immediately prior to the Closing) and former officer and director of [Texas Hospice] or any of its Subsidiaries . . . ." TPA § 8.03(a). Section 8.03(d) makes clear that Indemnified Persons, regardless of whether or not they are parties to the Texas Purchase Agreement, have rights as third-party beneficiaries under Section 8.03. *See* TPA § 8.03(d) ("The provisions of this Section 8.03 are intended for the benefit of, and will be enforceable by, each Indemnified Person at or prior to the Closing Date, and are in addition to, and not in substitution for, any other rights to indemnification or contribution that such person may have had by contract or otherwise.").

32

Under Curo Holdings' reading of Article IX, the limitations in Section 9.03(a) on White and Kumar's ability to recover deal-related indemnification in their capacities as Seller Parties would reach back and limit their ability to receive advancement in their capacities as Indemnified Persons. This in turn creates two sub-categories of Indemnified Persons. For Indemnified Persons who are not also Seller Parties, the right to advancement under Section 8.03(a) is unlimited. But for Indemnified Persons like White and Kumar who are also Seller Parties, the right to advancement is capped by the deal-related indemnification structure. The conundrums created by this interpretation can be avoided by recognizing that limitations which apply when individuals seek indemnification as Seller Parties do not apply when the same individuals seek advancement as Indemnified Persons.

Fifth, if Curo Holdings were correct and the parties wanted to place a ceiling on the amount of advancements that White and Kumar could obtain from Curo Holdings, then the drafters of the Texas Purchase Agreement chose an implausibly circuitous and tortured means of implementing that agreement. The most straightforward way to accomplish that result would be to say in Section 8.03(a) that there is a cap on the amount of money that Curo Holdings was obligated to advance. The language could have been quite straightforward, such as, "Curo Holdings will not be obligated to provide any advancement to White and Kumar once it has advanced an amount equal to the Curo Texas Escrow Amount." That language would have had the benefit of clearly establishing a cap and distinguishing between White and Kumar and other Indemnified Persons. Instead, Section 8.03(a) is unlimited by its terms and does not distinguish among Indemnified Persons. Just

33

as it did with the sixteen-word Parenthetical Limitation addressed in the Rule 12(b)(6) Decision, Curo Holdings has discovered a substantive limitation on a facially uncapped advancement right by stitching together a series of provisions from other parts of the agreement. *See* 2016 WL 6091692, at *20, *27. What results is a facially unreasonable reading.

Finally, assuming that the Cap Argument somehow otherwise applied, it fails as to advancements because of the nature of an advancement obligation. Chancellor Allen explained a quarter of a century ago that

> [i]n making a decision to advance expenses to a director or officer, the corporation is not extending the amount by which it may be legally liable, as it does when it extends indemnification rights. The right to be indemnified for expenses will exist (or will not) depending upon factors quite independent of the decision to advance expenses. Thus, the decision to extend advancement right should ultimately give rise to no net liability on the corporation's part. . . . [T]he advancement decision is essentially simply a decision to advance credit.

*Advanced Mining Sys., Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ch. 1992) (Allen, C.). "If it is subsequently determined that a corporate official is not entitled to indemnification, he or she will have to repay the funds advanced." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 214 (Del. 2005).

Under the deal-related indemnification provisions in Article IX, White and Kumar as Seller Parties can seek indemnification for "Losses," and Curo Holdings is protected by limitations against its obligation to pay for "Losses." *See* TPA § 9.03. The agreement defines "Losses" as "any loss, liability, cost, damage, expense (including reasonable attorney's fees and expenses), judgment, fine, assessment or claim." *Id.* § 9.02(a). Each of

34

these concepts, as used in the deal-related indemnification provisions, contemplates an amount that has been paid and cannot otherwise be recovered. It does not contemplate a loan that is intended to be repaid. If White and Kumar repay their advances, as they have undertaken to do, then Curo Holdings will not have suffered a Loss. What this means is that even if Curo Holdings were correct in its interpretation of the interrelationship between deal-related indemnification and personal indemnification, its arguments about deal-related indemnification would not come into play until after a determination that White and Kumar were not entitled to indemnification and had failed to repay the advancements they had received. Invoking the cap now is premature, because it is not yet possible to determine whether Curo Holdings has been "obligated to pay" the amounts advanced to the Seller Parties. Curo Holdings has been obligated to make a loan, but it has not yet suffered a Loss.

The Cap Argument therefore does not provide any basis for limiting White and Kumar's advancement right. The Cap Argument instead was a vehicle for Curo Holdings to attempt to re-litigate the central argument that the Rule 12(b)(6) Decision rejected, namely that the deal-related indemnification provisions in Article IX limit the personal indemnification rights set forth in Section 8.03. Once again, they do not.

### D. Enforcement Expenses

White and Kumar have been successful on the merits in seeking advancements. They accordingly are entitled to indemnification for the expenses incurred enforcing their right to advancements. *See Reddy*, 2002 WL 1358761, at *9. The amount of the award should be "reasonably proportionate to the level of success . . . achieved." *Fasciana v. Electronic Data Sys. Corp.*, 829 A.2d 178, 184 (Del. Ch. 2003) (Strine, V.C.).

35

One method of determining proportionality is to compare the amount of advancements that the court awarded with the amount originally in dispute. The resulting fraction generates a percentage of success. Although other methods for assessing proportionality might be warranted in a different case, this decision awards the plaintiffs a similar percentage of their enforcement expenses.

In this case, advancements of $4,262,753.53 were in dispute. Using the Fitracks Procedures, the parties shall determine the amount of advancements to which White and Kumar are entitled based on the rulings in this decision. The parties shall use that amount to compute a percentage of the enforcement expenses to which White and Kumar are entitled.

Given the positions that Curo Holdings has taken in response to White and Kumar's demands for advancement, beginning when White and Kumar first invoked their rights and continuing through the Rule 88 motion, a strong argument can be made that Curo Holdings has acted in bad faith and should be forced to bear 100% of White and Kumar's enforcement expenses. A strong argument also can be made in favor of adjusting the interest calculation to address the amount of time it has taken for White and Kumar to secure their advancements. This decision gives Curo Holdings the benefit of the doubt and does not yet reach the issue of bad faith.

### III.    CONCLUSION

As directed in the Entitlement Order, Curo Holdings shall advance to White and Kumar the reasonable expenses, including attorneys' fees, they have incurred in connection with the Government Investigation and the Qui Tam Action. In accordance with the

36

Fitracks Procedures and as directed in the Entitlement Order, Curo Holdings shall pay White and Kumar interest on the resulting amount, accruing at the legal rate beginning October 1, 2016. The parties shall proceed in accordance with the rulings made in this decision.